

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 2, 2021

**BY ECF**

Honorable Naomi Reice Buchwald
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Tracy Reynolds*, 20 Cr. 396 (NRB)

Dear Judge Buchwald:

      The Government respectfully submits this letter in advance of the sentencing of defendant Tracy Reynolds in the above-captioned matter, currently scheduled for June 7, 2021, at 11:30 a.m. For the reasons explained below, the Government respectfully submits that a sentence within the applicable Guidelines range of 24 to 30 months' incarceration, would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

**I.  Offense and Relevant Conduct**

    **A.  Background**

      In the early-to-mid-2000s, co-defendant Izhak Cohen co-owned and operated "Americana Escorts," an internet-based escort agency offering commercial sex services to customers in New York City and elsewhere . (April 27, 2021 Final Presentence Investigation Report ("PSR") ¶ 10). Reynolds worked for Cohen at Americana Escorts, including by assisting in advertising commercial sex services, providing data entry work, and eventually becoming a "phone booker" for the Americana Escorts agency, in which she received calls from customers and scheduled "dates" with sex workers. (*see* PSR ¶ 10). In or about April 2005, Cohen and others were arrested and prosecuted by the New York County District Attorney's Office ("DANY") for their participation in the Americana Escorts scheme. (PSR ¶ 10). In 2006, Cohen pled guilty to a money laundering offense to resolve the DANY case. In the mid-late 2000s, Cohen moved to Israel, where he has remained ever since. (PSR ¶ 10).

**B.  Reynolds' Role in the VIP Escorts Online Commercial Sex Service**

After Cohen resolved his DANY case, he resumed his previous activity operating a high-end online prostitution service, but renamed it "VIP Escorts."  (PSR ¶ 11).  Given Cohen's presence in Israel, Reynolds ran the day-to-day operations of VIP Escorts in the United States, while Cohen primarily serviced the enterprise's social media activity, rented Reynolds access to the VIP Escorts website and related websites, and provided advice and business partnership to Reynolds.  (PSR ¶ 11).

VIP Escorts maintained a website (the "VIP Escorts Website") registered at http://www.vipescorts.com which advertised its commercial sex services.   (PSR ¶ 12).  The domain for the VIP Escorts Website was registered via eNom, a domain name registrar, to Cohen at a P.O. Box in Hadera, Israel near Cohen's apartment.  (PSR ¶ 12).  eNom records show that the eNom account under which Cohen registered the VIP Escorts Website (the "Cohen eNom Account") contained, in total, registrations for 390 websites, including the VIP Escorts Website, and numerous sex and escort-affiliated websites.  (PSR ¶ 12).  Meanwhile, Reynolds signed the VIP Escorts Website up for hosting services, and maintained and serviced the VIP Escorts' account at the website's hosting company, which allowed content to be uploaded to the website.  (PSR ¶ 12).

The VIP Escorts Website included links to web pages depicting women offering prostitution services, referred to as "escorts," that included photographs of each escort, often partially dressed or nude and often posed in sexually explicit positions.  (PSR ¶ 13).  The website displayed the schedules for each escort, including, among other things, the city in which she was available, the days and hours when the escort was available, and the hourly rate to be charged for a client's time with the escort (often hundreds of dollars an hour).  (PSR ¶ 13).  Upon clicking the image of an escort, the user was linked to a more comprehensive description of the escort that detailed her, height, weight, and hip measurements.  (PSR ¶ 13).  A screenshot of the top portion of the homepage of the VIP Escorts Website taken during the Government's investigation, is attached hereto as Exhibit A.

VIP Escorts also operated a number of affiliated escort websites which advertised its prostitution services, with names such as "Prestige Escorts," "American Escorts," "Russian Escorts," and "Manhattan Exotics," among others (collectively, the "VIP Affiliate Websites").  (PSR ¶ 14).  All of the VIP Affiliate Websites were registered to Cohen in the Cohen eNom Account.  (PSR ¶ 14).  Reynolds regularly communicated with Cohen about website updates, including about the VIP Affiliate Websites.  (PSR ¶ 14).  VIP Escorts also operated social media accounts, including Twitter and Facebook, which advertised its prostitution services.  (PSR ¶ 16).  While Cohen typically controlled the VIP Escorts social media accounts, Reynolds provided

2

Cohen with much of its content, and frequently emailed him content for him to post to those accounts.  (*See* PSR ¶ 16).[1]

Reynolds advertised VIP Escorts and promoted its commercial sex services online, including on "Eros," which is a website known for advertising and promoting prostitution services. (PSR ¶ 15).  From in or about October 2012, through in or about May 2018, the VIP Escorts bank accounts set up and controlled by Reynolds, described further below, collectively paid approximately $295,493 on over 375 occasions to Eros to promote VIP Escorts.  (PSR ¶ 15).  In addition, advertisements for escorts associated with VIP Escorts also appeared on other websites similar to Eros and well-known in the online commercial sex industry, including The Erotic Review and The Erotic Monkey.  (PSR ¶ 15).

In addition, Reynolds, utilizing the name "Sara," recruited and interviewed escort candidates, often in person in New York City; solicited measurements and photos from them; and ultimately uploaded these photos to the VIP Escorts website.  (PSR ¶ 11).  Reynolds was also responsible for operating the VIP Escorts email address and phone numbers, through which clients booked appointments for commercial sex services with the escorts.  (PSR ¶ 11).  Reynolds regularly communicated with clients through email regarding upcoming "specials" and different types of commercial sex services that escorts were willing to perform.  (PSR ¶ 11; see, e.g., Compl. (Dkt. No. 1) ¶ 8.i & n.1).  Reynolds also arranged for car services to transport escorts across state lines to meet clients to engage in commercial sex transactions, including from Manhattan to New Jersey, and to other states.  (PSR ¶ 11).  Finally, she employed "bookers," whose primary job was to book appointments with particular escorts for clients as well as quote prices.  (PSR ¶ 27).

Reynolds, along with Cohen, then laundered the proceeds of the VIP Escorts' commercial sex services through a wide-array of bank accounts and financial instruments, as discussed more fully below.

## C.  Reynolds Launders the Proceeds of the VIP Escorts Scheme

Based on, among other things, a review of bank records and interviews with two woman ("Escort-1" and "Escort-2") who admitted to working for VIP Escorts, funds obtained from VIP Escorts' prostitution activities were laundered through a large number of personal and corporate bank accounts, controlled primarily by Reynolds, in order to promote the interstate commercial sex activity of VIP Escorts, enrich Reynolds and Cohen, and conceal the origins of the funds.

---

[1] For example, on August 4, 2017, Reynolds emailed Cohen with the subject line "posting threads." The body of the email contained dozens of specific posts or "taglines" sent to Cohen so that he could post them to VIP Escorts' social media feeds, including "You can meet and date gorgeous high class escorts in New York through New York VIP Escorts. Just give us a call and we will provide you exactly the kind of service you want."  On April 4, 2017, Reynolds emailed Cohen, stating, among other things, that she noticed that VIP Escorts had "a few accounts in [T]witter with no pictures" and attached several photos of women wearing lingerie and dressed in provocative poses for Cohen to post.

When VIP Escorts' customers paid the escorts providing commercial sex services in cash, the escorts would deposit those proceeds into bank accounts primarily opened and operated by Reynolds throughout the United States (the "Reynolds Bank Accounts"). (PSR ¶¶ 17, 27; Compl. ¶ 9.c). Other times, as described more fully below, clients paid for commercial sex services by credit card, and those credit card processing transactions would also be deposited into the Reynolds Bank Accounts, whereupon the escorts would be paid a fee via electronic bank transfer into the escorts' own bank accounts. (PSR ¶¶ 17, 27; Compl. ¶ 9.c). The Reynolds Bank Accounts were opened under Reynolds' name or in the name of a fictitious business entity that was created by and controlled by Reynolds. (PSR ¶ 17). These purported businesses changed over time, and were called, among other names, "TMW Incorporated;" "Venus Services LLC;" "Luxury Concierges Inc. DBA Luc Inc.;" "Venus Adult Online DBA Sensual Adult Toys;" and "United Concierges Inc." (collectively, the "Reynolds Entities"). (PSR ¶ 17).

In order to establish the Reynolds Bank Accounts, Reynold first incorporated the various Reynolds Entities, utilizing an outside accountant and, on occasion, a lawyer. Reynolds then opened business bank accounts in the names of the Reynolds Entities, and lied to the banks about the true purposes of the entities (often claiming the respective entity was in the advertising, marketing, or adult products industries), so that the banks would allow her to establish business bank accounts for those entities. Once the bank accounts were opened, Reynolds laundered the proceeds of the VIP Escorts commercial sex transactions through these bank accounts.

The banks at which Reynolds' opened accounts through which VIP Escorts proceeds were laundered would not have opened business bank accounts if they knew that illegally obtained proceeds would be flowing through the accounts.

Reynolds also utilized other individuals to establish entities and open bank accounts through which VIP Escorts' prostitution proceeds flowed, including her sister and boyfriend. (PSR ¶¶ 18, 28). For example, on or about April 4, 2018, Reynolds utilized her sister (the "Sister") to open a business bank account in the name of "United Concierges Inc." According to corporate records, United Concierges was first incorporated on or about May 1, 2015, with the Sister as its sole incorporator and registered agent. The application for United Concierges Inc. bank account listed the Sister as the "owner" of United Concierges, stated that the company was in the "Accommodation and Food Services" industry, and listed as the description of the business "catering." However, from on or about April 4, 2018, when the account was opened, until on or about September 28, 2018, when it was closed, virtually the only transactions in this bank account were transfers from other bank accounts controlled by Reynolds through which VIP Escorts transactions were laundered.

In addition, another individual, with whom Reynolds had a romantic relationship (the "Boyfriend") also set up bank accounts through which proceeds from VIP Escorts flowed. (PSR ¶¶ 18, 28). In particular, the Boyfriend opened approximately four bank accounts in the name of "Venus Flower Shop," which he used to operate a flower shop (the "Flower Shop") in the Colorado area. (PSR ¶ 28). One of those accounts received thousands of dollars in commercial sex proceeds from one of the Reynolds Bank Accounts that she formed under one of the Reynolds Entities called TMW Incorporated. (PSR ¶ 28).

4

After the various bank accounts were established, escorts working for VIP Escorts deposited prostitution proceeds, when paid in cash, directly into the Reynolds Bank Accounts, as noted above.  For example, from approximately October 2012 to approximately June 2018, six of the Reynolds Bank Accounts received approximately $263,468 combined from 437 cash deposits from locations in New York, California, New Jersey, Florida, Pennsylvania, and Washington D.C., from escorts working for VIP Escorts.  (*See* PSR ¶ 17).  During this same time period, approximately $219,474 in cash withdrawals were made from those accounts by Reynolds.  (PSR ¶ 17).

At Reynolds' direction, escorts working for VIP Escorts also accepted debit and credit cards as payments for commercial sex services, which often totaled thousands of dollars per encounter.  (PSR ¶ 19).  In order for VIP Escorts to be able to accept credit card transactions, Reynolds applied for, and was granted, a merchant account at a particular credit card processing company.  (PSR ¶ 19).  The merchant application listed Reynolds name, her email address, one of her purported businesses (LUC Concierges Inc.), and a website purportedly for advertising services, and listed the merchant code corresponding to "online advertising"; however, the vast majority of credit card processing that went into that account was for commercial sex services from the VIP Escorts business, totaling hundreds of thousands of dollars per year.  (PSR ¶¶ 19, 27).  The merchant bank would not have opened credit card processing accounts if they knew that the transactions would be in illegal activity, such as commercial sex services.  (PSR ¶ 19).  Being able to accept credit cards was crucial to the success of VIP Escorts, as many of the escorts frequently charged upwards of $700-$1,000 per hour, with "dates" typically costing customers thousands of dollars.

Reynolds also utilized payment companies such as PayPal and Venmo to receive and/or transfer proceeds of the VIP Escorts business.  (PSR ¶ 19).

From approximately 2012 through 2020, over $11 million was laundered through the conspiracy.  (PSR ¶ 11).  In total, bank records show approximately $1 million was withdrawn by Reynolds or paid directly to her from the proceeds of the scheme (PSR ¶ 26), a similar amount to the approximately $1.1 million that was sent to Cohen, as described below, while the remainder appeared to be used to pay escorts, advertising, and other expenses of the business.[2]

### D.  Payments to Cohen via International Money Laundering

Reynolds sent Cohen significant sums of money from the VIP Escorts business proceeds. Between 2013 and September 2019, these sums were the equivalent in Israeli shekels (the currency

---

[2] Thus, Reynolds is incorrect that she only received $263,248 from the scheme (Def. Submission at 9 n.6), as that was only the amount of <u>cash</u> deposits in certain of her bank accounts from escorts working for VIP Escorts.  (PSR ¶ 17).

in Israel) of over $1.1 million USD.[3]  (PSR ¶ 20).  These withdrawals were initially made via direct withdrawals from one of the Reynolds Bank Accounts from the proceeds of the prostitution business.  (PSR ¶ 20).  Starting in July 2016, however, in an apparent attempt to conceal the source of the funds, the vast majority of the cash transfers to Cohen were made through Cohen taking cash advances on an American Express credit card account controlled by Reynolds of relatively small amounts at each time in Israel, which Reynolds then payed off from one of the bank accounts that obtained proceeds of the VIP Escorts business.  (PSR ¶¶ 20, 23).  In total, Reynolds sent money to Cohen this way thousands of times in relatively small amounts. (PSR ¶ 23).   Cohen withdrew the money in thousands of ATM transactions at ATM location primarily in Hedera, Israel.  (PSR ¶ 23).

Emails sent between Reynolds and Cohen show that when Reynolds received a new credit card for the credit card account from which Cohen withdrew cash advances, Cohen asked her to mail it to him at his home in Hadera Israel.  (PSR ¶ 20).  Indeed, when Israeli law enforcement arrested Cohen in February 2020 at the request of the United States, they discovered credit cards at his apartment in the name of Reynolds.

In addition, records obtained from Western Union indicated that Reynolds also directly sent Cohen from the United States to Israel an aggregate amount of approximately $28,300 from approximately January 2011 to March 2017 in prostitution proceeds.  (PSR ¶ 24).

## II.  Procedural History

### A.  Reynold's Arrest, the Information, and the Guilty Plea

On or about February 7, 2020, the Honorable Sarah Netburn, United States Magistrate Judge for the Southern District of New York signed complaint 20 Mag. 1447 (the "Complaint") charging Reynolds and Cohen with money laundering conspiracy, promotion money laundering, and concealment money laundering, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i), (a)(1)(B)(i), (h), and 2.  (Dkt. No. 1).  The same day, Judge Netburn issued arrest warrants for Reynolds and Cohen.  On or about February 11, 2020, Reynolds was arrested at Tampa International Airport, as she was boarding a flight to Mexico.  (PSR ¶ 26).

In a *Mirandized* post arrest interview Reynolds was evasive, admitting she previously worked for Cohen, denying that she was running VIP Escorts, and denying that the escorts were performing commercial sex services for customers, instead claiming that they were merely providing time and companionship.

---

[3] It appears that the payments to Cohen ceased in approximately September 2019.  However, the VIP Escorts business remained operational until the Government arrested Reynolds and Cohen and shut down the websites in February 2020.  While Reynolds claims she voluntarily disassociated herself from Cohen months before her arrest (Def. Submission at 9), the Government's investigation revealed that Reynolds was fully involved in the commercial sex business until her arrest.  Indeed, bank records showed that she personally signed and sent checks to a particular escort for commercial sex services from the Luxury Concierges entity, including one check dated February 5, 2020, mere days before her arrest.

Reynolds was thereafter presented in the United States District Court in Tampa, Florida, where Magistrate Judge Amanda Arnold Sansone ordered Reynolds detained.[4]

On or about February 26, 2020, Reynolds arrived at and was presented in this District.  At the presentment, Magistrate Judge Sarah L. Cave ordered the defendant released subject to certain bail conditions agreed to by the parties, including the security of certain property owned by the Boyfriend.  (*See* Dkt. No. 5).  The Government agreed to the conditions of release, which were more strict than those proposed by Reynolds' at her initial presentment in Tampa, after negotiations with Reynolds' lawyer, which included discussions about Reynolds' proffering with the Government concerning numerous ongoing investigations related to money laundering and the commercial sex industry.

Following her arrest, Reynolds participated in two proffer sessions with the Government.  As discussed further below, the Government determined it would not offer Reynolds a cooperation agreement.  On August 5, 2020, Reynolds appeared before the Court via videoconferencing and consented to the Government filing an Information against her (the "Information"), which charged money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h).  (Dkt. No. 16).  That same day, the Government offered Reynolds a plea agreement (the "Plea Agreement").

The following day, on or about August 6, 2020, the grand jury sitting in this District returned an indictment of Cohen, in connection with the Government's efforts to extradite him from Israel.  (Dkt. No. 18).

On February 3, 2021, the Court conducted a change-of-plea hearing via videoconferencing, during which Reynolds pled guilty to the Information, pursuant to the Plea Agreement.

---

[4]  In a written order, Judge Sansone ruled that the evidence against Reynolds was strong; she was the signatory on numerous bank accounts through which over $10 million passed through during the course of the conspiracy; the alleged conspiracy was international in nature owing to her laundering money oversees to Cohen; the conspiracy lasted a considerable period of time, beginning at least as early as 2012; Reynolds had limited ties to Florida (or New York); and "upon arrest and Post-Miranda, the lead federal agent interviewed the defendant and determined she was trying to mislead the lead federal agent with her answers to specific questions he asked her." (Order, Dkt. No. 10, *United States v. Reynolds*, No. 20-mj-01140-AAS (M.D. FL. Feb. 24, 2020)). Judge Sansone also ruled that "[t]he defendant's offer of an unsecured bond co-signed by her friend is not adequate to reasonably deter the risk of flight if defendant is released."  (*Id.*)

On February 24, 2021, Israeli authorities arrested Cohen in connection with the Government's formal extradition request.[5]  (PSR ¶ 25).  Those extradition proceedings against Cohen in Israel remain ongoing.

### B.  The Plea Agreement

In the Plea Agreement, the Government's position as to the applicability of the Guidelines to Reynolds is as follows:

- The November 1, 2018 edition of the Guidelines Manual is applicable to the offense charged in the information.

- U.S.S.G. § 2S1.1(a)(1) applies to the offense charged in Count One.  Because the substantive offense underlying Count One is Title 18, United States Code, Section 1952(a) (the "Travel Act"), U.S.S.G. § 2E1.2 applies.

- Pursuant to Application Note Two of U.S.S.G. § 2E1.2, where the unlawful activity underlying a violation of the Travel Act is a State crime, "the offense level corresponding to the most analogous federal offense is to be used." U.S.S.G. § 2E1.2 cmt. n.2. The unlawful activity underlying Count One is the promotion of prostitution under New York State Penal Law ("NYPL") §§ 230.25, 230.20, which is most analogous to the Mann Act, 18 U.S.C. § 2421. *See*, *e.g.*, *United States v. Hurant*, 16-CR-45, 2017 WL 3327581, at *3-4 (E.D.N.Y. Aug. 1, 2017) (citing cases)

- Accordingly, pursuant to U.S.S.G. § 2G1.1(a)(2)—that is, the Guideline applicable to a violation of the Mann Act—the base level offense is 14.

- Pursuant to U.S.S.G. § 2S1.1(b)(2)(B), a two-level enhancement is added, because the defendant was convicted under 18 U.S.C. § 1956.

- Pursuant to U.S.S.G. § 3B1.1(a), a four-level enhancement is added, because the defendant was an organizer or leader of a criminal activity that involved five or more participants, or was otherwise extensive.

- Pursuant to U.S.S.G. § 3E1.1(a), the offense level is decreased by two levels because the defendant demonstrated acceptance of responsibility through her allocation (and will presumably continue to accept responsibility prior to imposition of a sentence).  Finally, the Government anticipates moving at sentencing for an addition one-level reduction pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of her intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

---

[5] Israeli authorities initially arrested Cohen on February 11, 2020, the same day Reynolds was arrested, in connection with the Government's request for a provisional arrest warrant.  (PSR ¶ 25). He was re-arrested on February 24, 2021, in connection with the Government's formal extradition request, which was delayed for several months due to the COVID-19 pandemic.

Therefore, in the Government's view, the total offense level under the Sentencing Guidelines is 17.  (Plea Agmt. at 2-3).

In the Plea Agreement, Reynolds agreed with the Government's Guidelines calculations summarized above with the exception of the applicability of the four-level enhancement pursuant to U.S.S.G. § 3B1.1.  In the defense's view, the applicable enhancement under U.S.S.G. § 3B1.1 is the two-level enhancement found in § 3B1.1(c).  Accordingly, the defense's position is that the total offense level is 15.  (Plea Agmt. at 3).

The parties further stipulated that the defendant has zero criminal history points and is in Criminal History Category I.

Accordingly, the parties agreed that the defendant's Guidelines range is either 18 to 24 months' imprisonment under the defendant's calculations or 24 to 30 months' imprisonment under the Government's calculations.  Accordingly, the stipulated Guidelines range is 18 to 30 months' imprisonment.  (Plea Agmt. at 3-4).

Finally, Reynolds agreed to forfeit to the United States (i) a sum of money equal to $11,445,854.72 in United States currency, representing property involved in the offense charged in Count One; and (ii) all right, title, and interest in four bank accounts seized by the Government in connection with this investigation.  (Plea Amt. at 1-2).  At Reynolds' change-of-plea proceeding, this Court entered a consent preliminary order of forfeiture consistent with this agreement.  (Dkt. No. 27).

## C.  The Probation Office's Position

The Probation Office released the PSR on April 27, 2021.  In the PSR, the Probation Office agreed with the Government with respect to the four-level enhancement pursuant to U.S.S.G. § 3B1.1(a), writing:

> While IZHAK COHEN did provide instruction to REYNOLDS on how to send him money in Israel, REYNOLDS opened various bank accounts and business entities herself, including setting a merchant bank account under her name so that VIP Escorts could accept credit cards.  REYNOLDS also used payment companies like PayPal and Venmo to receive and/or transfer proceeds of the VIP Escorts business. The participants involved, specifically the escorts employed by VIP Escorts, IZHAK COHEN, [the Sister], and [the Boyfriend] were either knowingly or unknowingly peculiar and necessary to the criminal scheme and led by REYNOLDS with specific criminal intent, to launder the proceeds of VIP Escorts. Thus, REYNOLDS was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, specifically, the defendant established numerous bank accounts, largely in her name, to launder funds; she utilized her sister and an individual she was romantically involved with to help launder funds. REYNOLDS applied for a merchant account at a particular credit card processing company to assist in the commission of the offense. In addition,

the escorts employed by VIP Escorts would deposit a portion or all of what she was paid in various bank accounts controlled by VIP Escorts but in the name of the various business entities that existed solely to launder the money; and the offense was otherwise extensive in that it laundered over $11 million over several years.

(PSR ¶ 29).

As to the appropriate sentence, the Probation Office recommends a below-Guidelines incarceratory sentence of 12 months and one day, writing that "based on the seriousness of the offense, an imprisonment term is necessary," but that Reynolds' lack of criminal history, and other mitigating factors resulted in their below-Guidelines recommendation.  (PSR at p. 25-26).

### D.  The Defendant's Submission

Reynolds filed her sentencing submission on May 28, 2021 ("Def. Submission") (Dkt. No. 34).  Reynolds disputes the Government's and the Probation Officer's position with respect to the leadership enhancement, and seeks a non-incarceratory sentence.

## III.  Discussion

### A.  Applicable Law

#### 1.  Sentencing Law

The Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

       (B)      to afford adequate deterrence to criminal conduct;

       (C)      to protect the public from further crimes of the defendant; and

       (D)      to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

    2.   Leadership Enhancement under U.S.S.G. § 3B1.1

Here, the sole Guidelines dispute is whether the four-level leadership enhancement should apply, or whether the Court should apply the two-level enhancement.

To properly apply §3B1.1(a) 4-level sentencing enhancement based on a defendant's role in criminal activity, this Court: (1) must find the defendant acted as a leader or organizer of criminal activity; and (2) must find criminal activity involved five or more participants, or was "otherwise extensive." *United Sates v. Escotto*, 121 F.3d 81, 85 (2d Cir. 1997).  In determining whether a defendant was an "organizer" or "leader" of criminal activity, as opposed to a "manager" or "supervisor," the Sentencing Guidelines commentary directs courts to consider:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1, comment, (n.4); *see United States v. Huerta*, 371 F.3d 88 (2d Cir. 2004).

As to the determination of whether the criminal activity involved "five or more participants," or was "otherwise extensive," the Guidelines commentary explains that "[a] 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted."  U.S.S.G. § 3B1.1, comment, (n.1).  The Second Circuit has explained that:

> In determining the number of participants, a district court considers: (1) the number of knowing participants in the criminal activity; (2) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; and (3) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme.

*United States v. Kent*, 821 F.3d 362, 369 (2d Cir. 2016).

In addition, the Guidelines commentary further provides that, "[i]n assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense

are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1, comment, (n.3).

The Guidelines further state that, in determining whether the aggravating role enhancement is appropriate to the money laundering charges to which Reynolds pled guilty, the enhancements "shall be determined based on the offense covered by this guideline (i.e., the laundering of criminally derived funds) and not on the underlying offense from which the laundered funds were derived." U.S.S.G. § 2S1.1, comment. (n.2(C)); *United States v. Mirzoyan*, No. 10 CR. 895 (PGG), 2017 WL 1501394, at *27 (S.D.N.Y. Apr. 26, 2017).

Even though the criminal activity must involve five or more participants or be "otherwise extensive," the Sentencing Guidelines merely require defendant was the organizer or leader of *one or more of those participants* for enhancement to be appropriate. *See United States v. Zichettello*, 208 F.3d 72, 107 (2d Cir. 2000) (emphasis added).

## B.  This Court Should Apply the Four-Level Leadership Enhancement, Consistent with the Government's and the Probation Office's Position

The Government respectfully submits that Court should apply the four-level leadership enhancement, pursuant to U.S.S.G. § 3B1.1(a), in accordance with the Government's and the Probation Office's position.

Here, Reynolds pled guilty to a sophisticated and multi-year money laundering conspiracy that laundered over $11 million in a complicated web of financial transactions from a massive nationwide high-end commercial sex operation.  The money laundering was a critical and essential component of the underlying Travel Act violations, as without the web of financial accounts and transactions Reynolds undertook, VIP Escorts would not have been able to operate, or garner the high rates, with escorts charging upwards of $700 to $1,000 an hour or more.

As described above, in order to launder the proceeds from the VIP Escorts business, Reynolds established numerous bank accounts in order to receive, transfer, conceal, and promote the underlying specified unlawful activity.  Additional moneys flowed through those accounts from credit card processing and money transmitting business like PayPal or Venmo.  Reynolds personally interview escort candidates, and also hired "bookers" to make appointments with customers.

Those bank accounts were either in Reynolds' name, or in the name of a fake business entity that was established by Reynolds herself or, at Reynolds' direction, her sister.  (PSR ¶ 17). While these businesses had many names, their predominant, if not sole, purpose was to launder the proceeds of the VIP Escorts business.  These accounts also collectively paid hundreds of thousands of dollars to promote the VIP Escorts business by paying, among other entities, Eros.com, a known advertising entity for commercial sex services.  (PSR ¶ 15).

Reynold also utilized her Sister and her Boyfriend to open business entities or bank accounts through which VIP Escorts money was laundered.  For example, as described above, on or about April 4, 2018, the Sister opened a business bank account in the name of United

Concierges, which purported to work in the "catering" business, but in fact virtually the only transactions on this bank account were transfers from other bank accounts controlled by Reynolds through which VIP Escorts transactions were laundered.

As for the Boyfriend, as described above, he set up approximately four separate bank accounts in the name of "Venus Flower Shop." During the time period charged in the conspiracy, one of these bank accounts received thousands of dollars in prostitution proceeds from one of Reynold's bank account in the name of "TMW Incorporated." That bank account, in turn, further laundered the proceeds by dissipating it among the other three Venus Flower Shop bank accounts.

While conceding the factual recitation in the PSR, Reynolds disputes that the Sister or the Boyfriend were properly legally considered participants in the conspiracy, claiming that the conspiracy only involved two individuals, Reynolds and Cohen. (Def. Submission at 14-15). For starters, Reynolds misapprehends when the four-level leadership enhancement applies, which does not depend entirely on the number of participants. *See United States v. Bennett*, 252 F.3d 559, 566 (2d Cir. 2001) ("Whether or not [the defendant's] activity involved five participants, the enhancement applies so long as the criminal activity was 'otherwise extensive' . . . .").

In any event, the conspiracy involved least five participants. First, while the Sister and the Boyfriend have not been charged, the Guidelines are clear that for purposes of the leadership enhancement, a "participant" is one "who is criminally responsible for the commission of the offense, but that person *need not have been convicted*." U.S.S.G. §3B1.1 (emphasis added).

With respect to the Boyfriend, Reynolds does not appear to dispute that prostitution proceeds from VIP Escorts bank accounts flowed through bank accounts opened by him related to the Flower Shop. She appears instead to be making a *legal* argument that because the prostitution proceeds were transferred to the Boyfriend's accounts for the alleged legitimate operations of the Flower Shop, those funds were not laundered. (Def. Submission at 14-15 (arguing that prostitution proceeds transferred to the Boyfriend's accounts were for the Flower Shop's "operations" and "had nothing to do with laundering"). Reynolds in incorrect as to the law. The question is not what the Boyfriend used the money for, but rather whether VIP Escorts funds were transferred or laundered through or to his accounts. *See, e.g., United States v. Prevezon Holdings, Ltd.*, 251 F. Supp. 3d 684, 698 (S.D.N.Y. 2017) (where "the Government can demonstrate that a culpable account in the money laundering chain was commingled with tainted and clean money, it 'need not 'trace' the funds used in the transaction to the charged unlawful conduct'"); *see also United States v. Weisberg*, 2011 WL 4345100, at *2 (E.D.N.Y. Sept. 15, 2011) ("[W]here there is a commingled account, and where the clean money facilitates the existence or concealment of the dirty money, the charged transaction can be said to have involved dirty money.").

In addition, whether or not the Boyfriend knew about the origins of the laundered funds, that is immaterial to the "otherwise extensive" analysis under the leadership enhancement. *See, e.g., Bennett*, 252 F.3d at 566 (holding four-level leadership enhancement properly applied where the defendant's criminal conduct "involved a wide array of witting *or unwitting* brokers, accountants, and bankers") (emphasis added); U.S.S.G. §3B1.1, cmt. n.3 ("a fraud that involved . . . the unknowing services of many outsiders could be considered extensive").

As for the Sister, she was involved in the VIP Escorts business and, as noted above, money flowed between her accounts and accounts owned by Reynolds, including the Untied Concierges account.  (PSR ¶ 28).[6]

Further evidence of the "otherwise extensive" money laundering conspiracy is Reynolds' leadership role in VIP Escorts' credit card processing, which were used to launder proceeds of the VIP Escorts business, lie to the banks, and conceal the source of the funds.  As noted above, Reynolds personally applied for a merchant account at a particular credit card processing company for the VIP Escorts business.  (PSR ¶ 27).  Reynolds tricked the merchant bank into approving her account there, enabling VIP Escorts to accept credit cards as payment for commercial sex, which payment was laundered under the guise of "online advertising."  Reynolds also utilized payment companies such as PayPal and Venmo to receive and/or transfer proceeds of the VIP Escorts business.  (PSR ¶ 19)  In short, Reynolds was instrumental in establishing the financial transactions necessary for the money laundering operation, showing her leadership in the enterprise.

In addition, Reynolds was instrumental in the international money laundering aspect of the crime.  As noted above, bank and credit card records show that Reynolds sent Cohen significant sums of money from VIP Escorts' commercial sex proceeds—totaling the equivalent in Israeli shekels of over $1.1 million between 2013 and September 2019.  (PSR ¶ 20).  Reynolds did not just wire Cohen the money, however.  In order to conceal the nature and source of the funds, Reynolds and Cohen created a scheme whereby Cohen would take thousands of small cash advances on Reynolds' credit cards at ATM locations in Israel and then Reynolds would pay back those cash advances from the proceeds of the prostitution business.  This scheme enabled Cohen to receive money in Israel but without Reynolds having physically to send the vast majority to him directly, thereby concealing the true purposes of the proceeds.[7]

In addition to Reynolds, Cohen, the Sister, and the Boyfriend, the conspiracy also utilized numerous professionals (including accountants and lawyers) who helped Reynolds create her fake companies.  (See Def. Submission at 14 (acknowledging that others provided "accounting services" or "facilitated the opening of accounts" through which money was laundered)).  In addition to the women performing commercial sex services and the VIP Escorts "bookers" who booked "dates" with customers, Reynolds also utilized an outside vendor to set up the VIP Escorts website, which was instrumental in promoting the specified unlawful activity and facilitating the money laundering.  Case law is clear that even if these other individuals and outside vendors were not aware of the money laundering activities, they can still be considered when determining whether the criminal conduct is "otherwise extensive."  See, e.g., Bennett, 252 F.3d at 566 (noting that a fraud involving unknowing services of outsiders can be considered "otherwise extensive."); U.S.S.G. § 3B1.1(a) cmt. n.3; see also United States v. Archer, 671 F.3d 149, 166 (2d Cir.2011) (affirming the application of a § 3B1.1(a) enhancement because it was uncontested that there were at least three knowing participants and "a fair number" of unknowing participants, "the precise

_____

[6] In addition, money was also frequently exchanged between the two with laundered funds utilizing payment services like Venmo and Paypal.  Finally, the Government interviewed at least one escort who admitted to working for both Reynolds and her sister.

[7] Reynolds also sent Cohen via Western Union approximately $28,300 from approximately January 2011 through March 2017.

number being impossible to determine").  In any event, the escorts' activities in depositing prostitution proceeds in cash or in providing Reynolds with the credit card information was crucial to the money laundering activities and are properly counted under these cases.

Finally, there were numerous other indicia of "otherwise extensive" criminal conduct regardless of the number of individuals involved.  *See United States v. Rubenstein*, 403 F.3d 93, 99 (2d Cir. 2005) (affirming the application of a § 3B1.1(a) enhancement where there were only "two knowing participants" because of the numerous unknowing participants and otherwise extensive nature of the criminal conduct).  Here, the charged conspiracy lasted a substantial period of time (from 2012 through 2020), during which over $11 million was laundered by the conspiracy.  In fact, as the defense concedes in its sentencing submission, the criminal conduct likely occurred even before then, starting in 2011.  (*See* Def Submission at 17 (stating that "[i]n 2011, Cohen contacted Ms. Reynolds and asked her to assist him with sales of certain websites, and then asked her to resume management of the business . . . .").  In addition, while outside of the statute of limitations, Reynolds participated in similar conduct in the early-mid 2000s, also with Cohen (PSR ¶ 10), which Reynolds acknowledges in her sentencing submission.  (*See* Def. Submission at 7 (admitting that in the early 2000s, Reynolds worked as a phone booker for Cohen's escorts business until sometime in 2006)).

Based on the above, the Government respectfully submits that the Court apply the four-level leadership enhancement pursuant to U.S.S.G. § 3B1.1(a) and not the two-level leadership enhancement proposed by the defense.[8]

## C.  This Court Should Impose a Sentence Within the Applicable Guidelines Range

A sentence within the applicable Guidelines Range would appropriately take into account the factors set forth in 18 U.S.C. § 3553(a).  In this case, the most salient factors are the nature and circumstances of the offense, the need to afford adequate deterrence to criminal conduct, and to provide just punishment for the offense.

Reynolds ran a sophisticated money laundering scheme that laundered over $11 million in at least an eight-year period in connection with her operation of a high-end online prostitution enterprise.  This activity involved hundreds if not thousands of commercial sex transactions between primarily female escorts and primarily male customers in New York and in numerous states throughout the country.  Reynolds, and her partner Cohen, utilized numerous websites, including the VIP Escorts Website; had a large social media presence; and regularly advertised on websites known to promote prostitution, including Eros.

---

[8] The Government notes that it also takes the position that the four-level enhancement applies to Cohen, should he be extradited and convicted, and case law is clear that "[o]ne conspirator's leadership role is not dispositive as to whether another was also a leader." *United States v. Duncan*, 42 F.3d 97, 106 n.6 (2d Cir. 1994); *see also* U.S.S.G. §3B1.1, cmt. n.4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.").

As the business grew more successful, it employed escorts who charged upwards of $700 to $1,000 per hour, making "dates" with VIP Escorts' customers cost thousands, and sometimes tens of thousands of dollars. Given these large charges for commercial sex transactions, VIP Escorts needed the ability to accept credit cards. So Reynolds applied for a merchant bank account, but lied to the bank by claiming that the transactions would be related to "online advertising." (PSR ¶ 27). Soon, hundreds of thousands of dollars in yearly credit card transactions were pouring in from commercial sex transactions, but were unwittingly laundered by the merchant bank and miscoded as "online advertising." Reynolds also dissipated the funds through a wide web of bank accounts, frequently in the names of the Reynolds Entities, and even utilized her Sister and Boyfriend to help launder the funds. These entities had been established to launder the VIP Escorts funds, but when Reynolds opened business bank accounts in the names of these entities, she lied to the banks and claimed that the entities were doing various legitimate businesses.

Furthermore, Reynolds ensured Cohen received a significant portion of VIP Escorts' earnings (totally approximately $1.1 million), but she and Cohen agreed that he would receive his portion of the proceeds in a way that concealed the nature and origins of the funds. By having Cohen take literally thousands of small cash advances on Reynolds' credit card in Israel (which Reynolds paid back through VIP Escorts' prostitution proceeds), Reynolds was able to send him large sums of money internationally without having to wire funds directly to him. This scheme undermined the integrity of our international financial system.

Finally, while Reynolds did attempt to cooperate with the Government, this attempt does not warrant a sentence below 24 to 30 months' of imprisonment. As noted in her submission, Reynolds did attend two proffer sessions with the Government and did provide the information discussed on pages 17 to 18 of the defense sentencing submission. Ultimately, however, the defendant did not have sufficient, first-hand information against any available targets (other than Cohen) to be of substantial assistance to the Government's continued investigations into money laundering and human trafficking operations in the commercial sex industry. With respect to Cohen, for whom the Government is pursuing extradition from Israel, ultimately the Government determined that it possessed sufficient evidence to prevail at trial without the testimony of Reynolds, and that Reynolds and Cohen had roughly similar levels of culpability. Accordingly, the Government did not offer Reynolds a cooperation agreement. In the end, Reynolds' attempts to cooperate does not merit the sentencing variance she seeks, especially in light of the fact that she has not been required to plead to all potential charges, which would have resulted in a higher Guidelines range.

In the end, Reynolds ran the operations of a sophisticated multi-year million-dollar money laundering operation, conduct that undermines our financial system both here and internationally, and cannot be tolerated. A Guidelines sentence is warranted both to deter such conduct and to provide just punishment.

## IV.  <u>Conclusion</u>

For the reasons set forth above, the Government respectfully requests that the Court impose a Guidelines recommended sentence of 24 to 30 months' incarceration. This sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By:  _____
Michael R. Herman
Assistant United States Attorney
(212) 637-2221